pA – David Dunlavey
DA – Michael Haenn

STATE OF MAINE                          SUPERIOR COURT
AROOSTOOK, SS.                          Docket No. CV-97-086

MAINE FARMERS                  )
EXCHANGE, INC.,                )
                               )
          Plaintiff,           )
                               )
                               )
          v.                   )       **DECISION AND JUDGMENT**
                               )
                               )
FARM CREDIT OF MAINE,          )
A.C.A., et al.,                )
                               )
          Defendant.           )

This matter was tried before this Court on Maine Farmers Exchange, Inc.'s,

(MFX), Declaratory Judgment action filed with the Bankruptcy Court and later

transferred to the Superior Court for resolution.

Farm Credit of Maine, A.C.A., ("Farm Credit"), a corporation organized under

the laws of the United States under the Farm Credit Act of 1971, loaned money for

the 1995-1996 potato growing season to Gordon Wathen and Glendon Wathen,

potato farmers; and Nightingale Enterprises, Inc., ("NEI"), a corporation formed to

primarily lease equipment and store, pack, and sell potatoes. Farm Credit's perfected

security interest in NEI's crops and proceeds, and notice of that security interest to

Maine Farmer's Exchange, Inc., ("MFX"), a corporation in the business of buying and

selling potatoes is not in dispute. MFX wrote checks for NEI's bagged potatoes

jointly to Farm Credit and NEI. Although the security agreement required written

1

authority prior to selling potatoes,[1] in practice, however, Farm Credit only orally discussed how NEI anticipated "to market the crop and the contracts associated with marketing the crops." Defendant's Ex. 15A at 81.

As early as August 30, 1995, Farm Credit was aware that there may be "shortfalls in meeting financial objectives and full repayment of all scheduled debt." Defendant's Ex. 11A. On February 1, 1996, MFX advanced $100,000. to NEI so that NEI could take advantage of a favorable payment arrangement offered by Maine Potato Growers, Inc. MFX and NEI agreed that MFX would deduct weekly amounts from invoices it owed NEI for future potato sales. Defendant's Ex. 15A at 31, 84. The record is not clear as to what Farm Credit knew about this financing arrangement.[2] The full $100,000. was deducted from invoices by approximately May, 1996.

---

1. The Security agreement at (1) states:

It is understood that the use of the terms 'proceeds,' 'substitutions,' 'replacements,' 'accessions,' and 'additions' does not give the Debtor authority, express or implied, to sell or otherwise dispose of the Collateral, unless Debtor is hereafter specifically authorized to do so. The within grant of a security interest is in addition to and supplemental of any security interest previously or herewith granted by the Debtor to the Secured Party.

Section 3(H) of the Security Agreements states:

Without the prior written consent of Secured Party, (1) Debtor will not sell, lease, transfer, assign or otherwise dispose of any of the collateral, nor permit any liens, security interests or encumbrances to attach to any of the collateral, except in favor of Secured Party.

Defendant's Ex. 2A, 5A & 7A.

2. Gordon Wathen testified he was not sure if the $100,000. check was made out to both NEI and Farm Credit. Wathen stated "And certainly that being in Nightingale's best interest and Farm Credit as the lender, I would have communicated that fact to Neil and --. Defendant's Exhibit 15A at 87. "I don't recall whether those appeared on the "Unpaid Orders Reports." I do know that the advances, the deducts for the advances, did appear on that report as negatives at the bottom of the report and then as they were actually applied to weekly checks, then they would be taken off because they were realized." Id. at 91.

2

In early 1996, at about the same time when NEI was beginning to pay off the $100,000. advance from MFX, NEI was cut off as a credit customer by Northeast Packaging and Allstate, bag sellers. Because MFX wanted to purchase bagged potatoes from NEI, MFX permitted NEI to charge bags to MFX's open accounts with Northeast Packaging and Allstate. MFX wanted to deduct the amount due for bags from each shipment invoice, however, NEI requested, and MFX agreed that MFX would pay NEI the total price for bagged potatoes and NEI would then write MFX a check for the bags. In April, 1996, NEI defaulted on bag payments. MFX then agreed to keep a running tab on the amount due for bag reimbursement and to deduct payment from invoices at a later time in a similar fashion as it was doing for the $100,000. advance. Under this modified arrangement, MFX would charge 14% interest on the outstanding bag debt. Defendant's Ex. 15A at 85.

MFX attached a summary of deductions to the joint checks which included "national and state potato tax on each load, inspections, [freight], that type of thing" and deductions to repay the $100,000. advance.[3] Defendant's Ex. 15A. The June 7, 1996 check showed the bag deduction. NEI did not forward the itemizations to Farm

---

3. For example, the attached itemizations to MFX's checks in May showed deductions for the $100,000. as follows:
May 31, 1996 02/01/96 $8,300
May 24, 1996 02/01/96 $8,700
May 17, 1996 Advance deduction 11/24/95 for $3,500 and $3,166.69
May 9, 1996 11/24/95 advance deduction $3,500.
                    Nightingale Ck. $8,300
                    Transfer to 5/3 check    $6,000
                    May 3, 1996 Transfer from 960412   $6,000

Credit. Accordingly, Mr. Piper, Vice President of Farm Credit, adjusted the "release price,"[4] based only on NEI's monthly financial summaries showing predictions for the remaining unsold crops as well as accruing payables. Defendant's Ex. 11A.[5]

In May, when the $100,000 advance was repaid, NEI requested MFX to hold off a bit longer before deducting the bag money to assist it with its cash flow. Defendant's Exhibit 15A at 85. On May 29, 1996, MFX made its last crop purchase from NEI. MFX set off the $92,270.59 due for bags from its June 7, 1996 payment to Farm Credit and NEI.

On July 18, 1996, NEI and the Wathens commenced Chapter 11 bankruptcy proceedings.[6] Defendant's Ex. 17A. Farm Credit received relief from the automatic stay in order to pursue a claim, as a secured lender, against MFX for the set-off sums. Defendant's Ex. 17A. MFX filed for a declaratory judgment with the Bankruptcy

---

4. Release price is the minimum amount which must be paid to a crop lender from each crop sale proceeds check to ensure satisfaction of the crop loan.

5. NEI provided financial projections which showed an increasing accounts payable to MFX and reflected payments due MFX. For example, the June 1, 1996 projection sheet showed a deduction of $8,300 to MFX. Defendant's Ex. 13. Farm Credit, clearly aware of NEI's financial difficulties, discussed "about what those funds were for and what had been deducted from those sale proceeds by MFX." Defendant's Ex. 15A at 37-38, 77. Exhibit 11A reflects that Neil Piper was keeping watch over NEI's account and that Farm Credit was increasingly concerned concerning cash flow of NEI and Farm Credit's position of security. Farm Credit, however, did not discern from an in depth review of NEI's financial statements the reason money was being deducted by MFX on a weekly basis and what the increasing account payable to MFX encompassed prior to calculating the "release payments." Defendant's Ex. 11A. Gordon Wathen testified concerning "release payments" that: "It was a negotiated amount, or percentage amount per hundredweight, and a check appropriate for that negotiated amount was cut weekly and the checks were given in exchange for Neil's signature on the checks so we could deposit the entire check and use the net funds to pay other bills." Defendant's Ex. 15A at 49.

6. The Chapter 11 proceedings were later converted to Chapter 7 proceedings.

4

Court claiming priority to this set-off from payment to NEI on (1) common law set-off grounds; (2) pursuant to 11 M.R.S.A. § 9-318(a)(1); and (3) under the equitable theory of unjust enrichment. Farm Credit counterclaimed. A bench trial was held October 2 and 3, 2000.

## DISCUSSION

The primary issues in this case are whether Section 9-318 of the Uniform Commercial Code, ("UCC"), applies to the facts presented here, and, if so, whether the MFX's set-off claim "arose out of" the contract between MFX and NEI. Although the filing requirements of Article 9 of the UCC do not apply to the right to set off, section 9-318 (1), rather than common law, governs priority between MFX's right to set-off and Farm Credit's perfected security interest. 11 M.R.S.A. § 9-104 (1995). See In Re Apex Oil, Co., 975 F.2d 1365, 1368 (8th Cir. 1992). Finding that Article 9 applies to MFX's set-off claim, the remaining issue is whether MFX's claimed right to set-off against Farm Credit's security interest in NEI's accounts receivable pursuant to 11 M.R.S.A. § 9-318 "arose out of" the agreement between MFX and NEI. 11 M.R.S.A. § 9-318 provides:

> (1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9-206, the rights of an assignee are subject to
>
> (a) All the terms of the contract between the account debtor and assignor and any defenses or claim arising therefrom; and
>
> (b) Any other defenses or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment . . .

11 M.R.S.A. § 9-318 (1) (1995).

5

Because Farm Credit notified MFX of its security interest in August, 1995, MFX must show that its set-off rights arise out of the contract between assignor and account debtor. 11 M.R.S.A. § 9-318 (1).[7] Farm Credit's argument that MFX is not an account debtor because NEI also owed MFX money and because MFX charged interest is without merit. See Harris v. Dial Corp. 954 F.2d 990 (4th Cir. 1992) (finding Dial Corp. was considered an account debtor even though it charged a mark up on the resin it sold); Barclay American/Business Credit, Inc. v. Paul Safran Metal Co., 546 F. Supp. 264 (N.D. Ill. 1983) (finding that mutual accounts receivable did not require classifying assignor as an account creditor rather than an account debtor).[8]

There is no Maine case law on point. Reported cases from other jurisdictions interpreting section 9-318 (1)[9] require that if an account debtor has been notified of the assignee's security interest, then the only defenses that can be raised are those

---

7. When the account debtor's defenses on an assigned claim arise from the contract between him and the assignor, it makes no difference whether the breach giving rise to the defense occurs before of after the account debtor is notified of the assignment. 11 M.R.S.A. 9-318 (1)(a) cmt. 1; Independent Nat. Bank v. Westmoor Elec., 795 P.2d 210, 216 (Ariz. App. 1990).

The rights of the assignee of an account receivable are subject to contract defenses or claims of the account debtor arising by virtue of the terms of the contract out of which the receivable was created. See Gilmore. The Assignee of Contracts Rights and His Precarious Security. 74 Yale L. J. 217, 230 (1964).

8. The Security Agreement between Farm Credit and NEI covered NEI's present and future accounts receivable. Under the Code, there is no distinction between a party with a security interest in a debtor's accounts receivables and a party who is an assignee of a debtor's accounts receivable. Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1190 (7th Cir. 1990). Thus, Farm Credit is the assignee, NEI is the assignor, and MFX the account debtor. See In Re Otha C. Jean & Associates, Inc., 152 B.R. 219, 222-23 (Bkrtcy. E.D. Tenn. 1993).

9. Decisions from other jurisdictions should be followed when they are well-reasoned and consistent with the purposes of the Code. International Harvest. Cr. Corp. v. American Nat. Bk, 296 So.2d 32, 36 (Fla. 1974).

6

that arise out of the contract between the assignor and account debtor.[10] United Cal. Bank v. Eastern Mountain Sports, 546 F. Supp. 945, 963 (D. Mass. 1982). Farm Credit argues that MFX's set-off claim did not arise out of the agreement between MFX and NEI because MFX did not require (1) NEI to purchase its bagging from MFX; (2) the open account arrangement as between MFX and NEI pre-dated, and was independent of a significant number of the orders which MFX eventually placed with NEI; and (3) NEI took advantage of the credit arrangement with MFX to buy bags for sales to buyers of its crop other than MFX.

In a case involving set-off claims for sums advanced to harvest crops, a California court found harvesting costs did not arise under the contract because: (1) the harvesting contract was made more than three months after sales contracts were signed; (2) involved subject matter and third-party claims not included in sales contract; (3) buyer understood that it had to request subordination of the assignment

---

10. First New England Financial Corp. v. Woffard, 421 So. 2d 590 (Fla. App. 1982) (finding a breach of warranty arose out of the contract between account debtor and assignor when buyer specified what the boat was to be used for and the boat did not meet those requirements); 4447 Associates v. First Sec. Financial, 889 P.2d 467 (Utah App. 1995) (finding that First Security's $1,000,000 offset for the decreased value of the assets arose directly from the contract terms of its asset purchase agreement with Capitol when the contract contained a guarantee against drop in price; First Nat. Bank v. Thomson Consumer Electronics , 84 F.3d 397, 399 (11th Cir. 1996) (finding recoupment claims for shipments lost in transit arose out of the contract between assignor and account debtor and could be claimed against shipping invoices); In Re Otha C. Jean & Associates, Inc. 152 B.R. 219, 223 (Bkrtcy E.D. Tenn. 1993) (finding claims not subject to offset on overpayments made to assignor on earlier contacts under section 9-318(1) because not the same contract); Graves Equip., Inc. v. M. DeMatteo Construction Co., 489 N.E. 2d 1010 (Mass. 1986) (finding DeMatteo's defense arose out of the contract whereby Dirt Movers agreed to supply certain materials required under the Department of Public Works contract for which DeMatteo was the general contractor. Dirt Movers was paid except DeMatteo retained retainage of $10,692.52. Dirt Movers assigned the retainage due it to Graves. When Dirt Movers failed to perform the remainder of the contract, DeMatteo had to spend extra money for the services Dirt Movers had contracted for in the amount of $19,270.65. The court found that DeMatteo could offset the retainage amount). Graves v. DeMatteo 489 N.E.2d at 1012.

in order to pay proceeds to another party; and (4) buyer paid harvesting costs in breach of its own internal polices. <u>Producers Cotton Oil Co. v. Amstar Corp.</u>, 197 Cal. App. 3d 638 (1988). <u>Amstar</u> is distinguishable from the case at bar, however, because Amstar (1) did not make payments directly to the assignee, Producers, after receiving notice of the assignment, (2) knew it had to get permission for subordination, (3) bought the crop with actual knowledge that the sale violated Producer's security interest in those proceeds, and (4) the assignment said no set off or deductions by buyer. Here, even though the Security Agreements said written permission was required to sell and that course of dealings would not alter the Security Agreement absent authorization for change in writing, Farm Credit's authorization for NEI to sell the potatoes in 1995-96 is evidenced in Neil Piper's letters. Defendant's Ex. 11A. Based on the prior and current course of dealings between NEI and Farm Credit, the fact MFX was writing <u>joint</u> checks to Farm Credit and NEI, and Farm Credit's failure to object to the weekly deductions for the $100,000. advance, the court finds that if MFX knew a signed agreement was necessary, it reasonably assumed Farm Credit had waived that provision at least for the current season, such that MFX did not know it was violating any terms of Farm Credit's Security Agreement.

In analyzing the overall relationship between the parties, this Court finds that MFX's bag set-off claim arises out of the contract between MFX, account debtor, and NEI, assignor. Farm Credit annually loaned money to NEI, or its predecessor for potato growing. The defaulted loan in this case was for growing and selling potatoes

8

for the 1995-96 season. Mr. Piper would discuss potato sales with NEI and the understanding was to market the potatoes for the highest yield.[11] Defendant's Ex. 15A.[12] Testimony at trial establishes that the intent of the agreement between MFX and NEI was for the packaging and selling of NEI's potatoes for the 1995-96 season. As part of this ongoing relationship, MFX advanced $100,000. to NEI. Although there was no written requirement for NEI to purchase bags through MFX, NEI was obligated to sell MFX its potatoes to repay the $100,000. loan. When NEI could not obtain potato bags, MFX was indirectly obligated to allow NEI to charge the bags to MFX's account if it wanted to have the $100,000. advance repaid out of future potato sales from NEI.

The court disagrees with Farm Credit's reasoning that the set-off claim does not arise out of the contract between MFX and NEI because invoices pre-dated the open account arrangement between MFX and NEI and was independent of a

---

11. Gordon Wathen testified "We were very much in discussion with Farm Credit, not only once it was harvested but before we got the loans pertaining to the '96 crop on how we anticipated to market the crop and the contracts associated with marketing the crop. And they were very much aware, namely Neil Piper and Farm Credit Board of Directors, on exactly how the operation would be run and how the crop would be marketed and the general terms between Nightingales and the sellers of the crop, in this case, namely MFX. And so there was agreement prior to a piece of seed being put in the ground and once the potatoes were in storage, Farm Credit was very much apprised of how it was going to be marketed. And obviously it was going to be marketed at the highest price levels possible, obtainable, by MFX and Nightingales in working together to market the crop. So there was a general agreement prior to sales by Farm Credit that that was an acceptable way of growing and harvesting and marketing the potato crop. And so, yes, I would say that they gave their approval prior to. Had they not been comfortable with that, they would have made their opinion known and would have not allowed it to happen. Defendant's Ex. 15A at 81.

12. In Massey-Ferguson Credit Corp. v. Brown, Massey-Ferguson was found liable to account debtor because it participated in the sale in question. If it had not, it would not be liable for debtors failure to perform. Massey-Ferguson Credit Corp. v. Brown, 567 P.2d 440, 443 (MT 1977).

9

significant number of the orders which MFX eventually placed with NEI. Here, all of NEI's accounts receivable had been assigned to Farm Credit. It is not a situation where only one invoice was assigned to the bank. See Seattle-First Nat. Bank v. Oregon Pac. Industries, Inc., 500 P.2d 1033, 1034 (Or. 1972) (the court, distinguishing between contract-related and the unrelated defenses and claims, found that Oregon Pacific Industries, Inc.'s set-off claim was an unrelated set-off because it arose out of a breach of a contract not connected with the invoice assigned to the bank). The finding would likely have been different had Oregon Pacific assigned the bank all its accounts receivable instead of only one invoice. Here, all of NEI's accounts receivable were assigned to Farm Credit, NEI and MFX had mutual accounts receivable, and NEI and MFX intended to deal with each other for the entire 1995-96 growing season.

Farm Credit finally argues that the bag bill does not arise out of the contract between NEI and MFX because NEI took advantage of the credit arrangement with MFX to buy bags for sales to buyers of its crop other than MFX. The sale of potatoes to other potato brokers was at most five percent of NEI's entire crop. That fact does not negate the main intent of the parties to treat the entire NEI-MFX account as a single contract or "running account" for the entire season, evidenced by MFX's continued advances to help NEI. See United Cal. Bank v. Eastern Mountain Sports, 546 F. Supp. 945 (D. Mass. 1982) (finding the course of dealing between EMS and Snow Lion was to treat the entire EMS-Snow-Lion account as a single contract or "running account"); Harris v. Dial Corp., 954 F.2d 990, 993 (4th Cir. 1992) (finding

10

intent of the parties at the time of the agreement is to be considered in determining whether there are two severable contracts). Thus, this Court finds that MFX's set-off defenses arise out of its contract with NEI.

The Court finds for the Defendant, Farm Credit of Maine, on MFX's claim of unjust enrichment. The Court finds there was a benefit conferred upon Farm Credit of Maine, and that it would be inequitable for Farm Credit to retain the benefit without payment for the value of the bagging to MFX, however, the Court finds that MFX has not met its burden in proving an appreciation or knowledge by Farm Credit of that benefit.

The entry is:

Judgment is entered in favor of MFX on its set-off claim in the amount of $92,270.59 against Farm Credit's security interest in accounts receivable.

Judgment for Farm Credit on MFX's claim of unjust enrichment.

Dated: _1_/_05_/_2001_

Hon. Paul Pierson
JUSTICE, SUPERIOR COURT

11