**In re U.S. AEROTEAM, INC., Debtor-in-Possession.**

**U.S. Aeroteam, Inc., Plaintiff,**

**v.**

**Delphi Automotive Systems, LLC, Defendant.**

**Bankruptcy No. 03–41063.
Adversary No. 04–3047.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

Aug. 1, 2005.

---

LAWRENCE S. WALTER, Bankruptcy Judge.

**DECISION OF THE COURT:**

1) **GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANT DELPHI AUTOMOTIVE SYSTEMS, LLC –AND–**

2) **DENYING SUMMARY JUDGMENT TO PLAINTIFF U.S. AEROTEAM, INC.**

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the standing General Order of Reference in this District. This proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This matter is before the court on the cross motions for summary judgment filed by Plaintiff U.S. Aeroteam, Inc. and Defendant Delphi Au-

tomotive Systems, LLC. Upon agreement of the parties and court order, Buckeye Retirement Co., LLC, as assignee to the rights of Provident Bank, has joined in the adversary proceeding as a party plaintiff. [Adv. Doc. 53.] The parties have filed their responsive documents and the matter is now ready for decision.

## PROCEDURAL AND FACTUAL BACKGROUND

### A. General Background

Prior to its bankruptcy filing, Plaintiff–Debtor U.S. Aeroteam, Inc. ("USAT") was a manufacturer of parts sold to both government entities and private industry in the aerospace and automotive fields. One of USAT's largest customers was Defendant Delphi Automotive Systems, LLC ("Delphi"), a Tier 1 manufacturer and supplier of automotive components, integrated systems, modules, parts and mobile electronics. Before the bankruptcy, several divisions of Delphi including Delphi Energy & Chassis Systems ("E & C"), Delphi Harrison Thermal Systems ("HTS") and Delphi Saginaw Steering Systems ("Saginaw Steering") contracted with USAT to supply Delphi with component parts that Delphi used to manufacture other component parts for delivery to its automotive industry customers including General Motors Corporation ("GM").

In 2002, USAT experienced difficulty paying its own suppliers for parts needed to assemble its components to be supplied to Delphi. USAT's troubled operations led it to file its bankruptcy petition on December 24, 2003.

Following the bankruptcy filing, Delphi filed a motion for relief from stay to exercise an alleged right to set off amounts Delphi owed to USAT. Delphi bases this setoff right on amounts USAT owes back to Delphi for USAT's purchase of rotors from Delphi's E & C division as well as Delphi's payment of USAT's debt to its supplier, Citation Foundries aka Texas Foundries ("Texas Foundries").

USAT opposed the motion for relief from the automatic stay asserting that the complex legal and factual issues raised by Delphi in the motion should be adjudicated within this adversary proceeding initiated by USAT through the filing of a complaint for turnover and to determine the validity and priority of Delphi's claimed setoff rights. The court agreed and subsequent to the filing of Delphi's answer and counterclaim asserting both a right of setoff and recoupment, both parties filed motions for summary judgment.

### B. Business Relationship Between Delphi Divisions and USAT

The core relationship between the parties focused on Delphi's purchase of parts from USAT. Various Delphi divisions used those parts to manufacture components for their automotive industry customers. Conversely, USAT purchased rotors from Delphi's E & C division. The rotors were used by USAT in assembling components that were then sold back to E & C. Based upon this relationship, both contracting parties had accounts payable to the other at the time of USAT's bankruptcy filing creating the basis for Delphi's setoff rights.

#### 1. Contractual Terms of Purchase Orders

With respect to the sale of parts to Delphi, the parties' contractual relationship was documented in purchase orders used by the Delphi divisions to purchase parts from USAT which USAT accepted by shipping parts to Delphi at stated prices. [Adv. Doc. 30, ¶ 8; Adv. Doc. 35, ¶ 10 and Adv. Doc. 36, Ex. 1 (summary of purchase orders).] The purchase orders set the prices for the relevant parts

through a date certain. [Adv. Doc. 30, ¶ 8.] The purchase orders obligated Delphi to order all of its specified parts through USAT and required USAT to deliver to Delphi a sufficient quantity of the parts to meet Delphi's production needs. *Id.* Delphi asserts that the failure of USAT to deliver the component parts it was contractually obligated to deliver could cause a shut down of manufacturing operations and irreparable harm to both GM and Delphi. USAT disputes that its ability to supply parts to Delphi could force such a shut down.

The purchase orders were subject to Delphi's General Terms and Conditions governing the terms of shipping, billing, quality, termination and other aspects of the parties' contractual obligations. [Adv. Doc. 36, Ex. 2.] Section 21 of the General Terms and Conditions, entitled "Setoff and Recovery," states:

> With respect to any monetary obligations of Seller [USAT] or Seller's affiliates to Buyer [Delphi] or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

*Id.* USAT does not dispute that the purchase orders were subject to the Terms and Conditions including this paragraph providing Delphi with setoff rights. [Adv. Doc. 41, ¶ 11.]

### 2. USAT's Accounts Receivable

After USAT began having trouble meeting its contractual obligations to Delphi, Delphi stopped payment on its accounts payable to USAT. USAT filed its bankruptcy petition on December 24, 2003.

USAT alleges that as of the bankruptcy filing date, its accounts receivable owing from the Delphi divisions totaled $819,857.19[1] apart from the damage claim against Saginaw Steering that is the subject of a separate adversary proceeding. [Adv. Doc. 30, Ex. A, ¶ 5.] Following the bankruptcy filing, Delphi paid USAT a portion of amounts owed prepetition, totaling $54,345.11, but retains possession of $755,120.00. [*Id.*, ¶¶ 6, 17.] Of the $755,120.00 still owed, Delphi accrued $444,214.36 of its accounts payable to USAT within the ninety days prior to USAT's bankruptcy filing. [*Id.*, ¶¶ 17–18.]

### 3. Delphi's Accounts Receivable and Payment of USAT's Debt to Texas Foundries

USAT owes prepetition amounts back to Delphi totaling approximately $755,120.00. As described in more detail below, the amounts owed are related to two debts arising from USAT's relationship with Delphi's E & C division. Specifically, USAT owes E & C for the purchase of rotors. Furthermore, Delphi paid USAT's debt to Texas Foundries and, in return, was assigned Texas Foundries rights on that claim.

USAT contracted with E & C to produce a part known as the hub and motor extension assembly ("Hub Assembly") and began production of the part in August of 2001. USAT purchased component parts for the HUB Assembly from other companies. [Adv. Doc. 30, ¶ 17.] HUB bearings were purchased from SKF Bearings, HUB castings from Texas Foundries and the rotors from E & C. [Adv. Doc. 30, ¶ 17–18.] USAT's purchase of the rotors from E & C was a separate transaction from E & C's purchase order with USAT to produce the

---

1. Delphi asserts that its own books demonstrate that it owed USAT $771,105.30 as of December 23, 2003. [Adv. Doc. 36. Ex. 1.] However, neither party appears to dispute that the amount Delphi currently owes USAT totals $755,120.00.

Hub Assembly. [Adv. Doc. 30, ¶ 19 and Ex. A, ¶ 12.]

In the beginning, USAT paid all of the suppliers of the component parts needed for the HUB Assembly. [Adv. Doc. 30, ¶ 16.] In late 2002 to 2003, however, USAT began having trouble paying its suppliers.

USAT stopped paying E & C for the rotors in 2002. [Adv. Doc. 35, ¶ 18.] As of the petition filing date, the accounts payable owed by USAT to E & C for the rotors totaled $567,683.84. [Id.; Adv. Doc. 41, ¶ 18.]

With regard to the castings, USAT accumulated accounts payable owed to Texas Foundries in the amount of $187,436.84. [Adv. Doc. 35, ¶ 19; Adv. Doc. 41, ¶ 19.] At some point in August of 2003, Delphi received notice of the accumulation of USAT's debt to Texas Foundries and Delphi feared that Texas Foundries would stop shipment of the castings absent full payment. [Adv. Doc. 39, Ex. A, ¶¶ 8–9.] The parties dispute the exact timing and nature of the notice, but agree that in late August of 2003, a series of correspondence occurred between employees of USAT, Delphi and Texas Foundries regarding USAT's troubled operations. [Id., ¶¶ 7–9; Adv. Doc. 41, ¶ 19.] On summary judgment, USAT objects to the presentation by Delphi of certain e-mails from Texas Foundries as impermissible hearsay.

The undisputed facts include that at 12:05 p.m. on August 26, 2003, USAT employee Jeff Milam sent an e-mail to George Mansfield and Thomas Dunn at Delphi advising that USAT wished to resolve the matter with Texas Foundries without the assistance of Delphi regarding the "old payables" owed to Texas Foundries. [Adv. Doc. 30, Ex. A–6.] USAT requested that

Delphi limit its assistance to consignment of materials moving forward. Id.

Nonetheless, at 2:16 p.m. on August 26, 2003, Thomas Dunn emailed Texas Foundries with Delphi's commitment to pay the $187,436.84 owed by USAT to Texas Foundries. [Adv. Doc. 36, Ex. 6; Adv. Doc. 41, ¶ 19.] In exchange, Texas Foundries was to assign to Delphi all rights in the corresponding receivables. [Adv. Doc. 36, Ex. 6.] Texas Foundries agreed to Delphi's terms and released production and shipment of the castings. Id. Delphi and Texas Foundries did not document their agreement with purchase orders and invoices until November of 2003. [Adv. Doc. 41, ¶ 19.] Furthermore, Delphi did not pay the $187,436.84 owed to Texas Foundries until January 7, 2004, following USAT's bankruptcy filing. [Adv. Doc. 35, ¶ 20; Adv. Doc. 41, ¶ 20.]

## C. USAT's Solvency During the Ninety Days Prior to Bankruptcy

Relevant to the viability of setoff rights accrued by Delphi during the ninety-day period prior to USAT's bankruptcy is USAT's solvency during that period. USAT uses its financial records and balance sheets to demonstrate that the company was insolvent. On December 24, 2003, USAT had book assets of $8,671,348.00 and liabilities totaling $10,437,691.00. [Adv. Doc. 30, Ex. A, ¶ 20.] USAT's adjusted balance sheet for ninety days prior to the bankruptcy (September 30, 2003) shows assets of $8,900,219.00 and liabilities of $9,954,703.00. Id.

Delphi disputes USAT's insolvency during this ninety-day period and argues that USAT is potentially solvent depending on the outcome of a separate adversary proceeding based on USAT's prepetition claim against Delphi.[2] USAT initiated the ad-

---

2. Delphi mentions, but does not analyze, that

USAT's litigation of claims against other par-

versary proceeding against Delphi's Saginaw Steering division seeking breach / cancellation of contract damages totaling $2,200,000.00.[3] If this damage award is added to USAT's assets, Delphi argues that USAT is solvent during the ninety-day period prior to its bankruptcy filing.

### D. Provident Bank's Security Interest in USAT's Accounts Receivable

Prior to the bankruptcy filing, USAT and Provident Bank[4] entered into a loan agreement memorialized in a note dated August 1, 2003. [Adv. Doc. 30, Ex. A, ¶ 22.] Per the agreement with Provident Bank, USAT borrowed the principal sum of $2,500,000.00. *Id.* The parties do not dispute that a properly filed financing statement dated December 11, 2000 perfects this lien. *Id.* Consequently, USAT's obligation to Provident Bank is secured by a perfected lien against all personal tangible and intangible assets of USAT including accounts receivable and inventory. *Id.* The amount owed to Provident Bank as of the bankruptcy filing totals approximately $2,045,000.00. *Id.*

### SUMMARY JUDGMENT STANDARD

The appropriate standard to address the cross motions for summary judgment filed in this adversary proceeding is contained in Fed.R.Civ.P. 56(c) and incorporated in bankruptcy adversary proceedings by reference in Fed. R. Bankr.P. 7056. Rule 56(c) states in part that a court must grant summary judgment to the moving party if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In order to prevail, the moving party, if bearing the burden of persuasion at trial, must establish all elements of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the burden is on the nonmoving party at trial, the movant must: 1) submit affirmative evidence that negates an essential element of the nonmoving party's claim; or 2) demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* at 331–32, 106 S.Ct. 2548. Thereafter, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 586–88, 106 S.Ct. 1348.

---

ties may also impact USAT's prepetition assets. [Adv. Doc. 39, p. 13 n. 7.]

**3.** This adversary proceeding involves USAT's sale of parts to Saginaw Steering related to three steering housing programs, the GMX 367, the GMX 245 and the GMT 610. Delphi eventually cancelled the purchase orders on these parts and USAT has submitted a $2.2 million claim on the cancellation of the GMT 610 steering housing program contract.

**4.** Provident Bank's claim was assigned to Buckeye Retirement Co., LLC, and Buckeye Retirement has been joined in this adversary as a party plaintiff. [Adv. Doc. 53.] Buckeye Retirement consents to the jurisdiction of the court and waives service. *[Id.]* Aside from joinder with USAT as a party plaintiff, Buckeye Retirement has chosen to remain inactive in this adversary proceeding.

## LEGAL ANALYSIS

### A. Summary of Arguments and Resolution

USAT requests that the court grant it summary judgment and order Delphi to turn over $755,120.00 owed to USAT in accounts payable because Delphi cannot demonstrate a valid right of setoff or recoupment and, even if it could, its rights would be trumped by Provident Bank's security interest in USAT's accounts receivable. Delphi opposes USAT's motion and filed a cross motion for summary judgment requesting that the court determine its setoff and recoupment rights to be valid and that the court grant it relief from the automatic stay to exercise those rights.

After reviewing the issues, the court concludes that Delphi has a valid right to set off its debt to USAT against USAT's debt to Delphi for unpaid rotors and for the Texas Foundries claim that has been assigned to Delphi. However, there remains an issue of fact regarding USAT's solvency during the ninety days prior to its bankruptcy filing. As this issue is critical to the validity of Delphi's setoff rights accruing during this ninety-day period, the issue of USAT's solvency must proceed to trial.

Finally, under Article 9 of the Uniform Commercial Code, Provident Bank's security interest in USAT's accounts receivable is taken subject to the agreement between the contracting parties including any setoff rights granted within the terms of the contract. Consequently, Delphi's contractual setoff rights have priority over Provident Bank's security interest in USAT's accounts receivable.

### B. Setoff Under 11 U.S.C. § 553 and Non-bankruptcy Law

 As a defense to turnover of prepetition amounts Delphi owes to USAT,

Delphi asserts that there are mutual debts owing between the parties and, consequently it has a right to set off its debt to USAT against USAT's debt to Delphi. Setoff is a doctrine that allows entities who owe money to each other to cancel out or apply their mutual debts against each other thereby avoiding the "absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). The right of setoff, created under state law, is preserved in bankruptcy to the extent permitted by 11 U.S.C. § 553. This section states:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

**(b)(1)** Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 362(b)(14), 365(h), 546(h), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

> **(A)** 90 days before the date of the filing of the petition; and

> **(B)** the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

**(2)** In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

**(c)** For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

11 U.S.C. § 553. As noted, this statute does not create a federal right of setoff, but, instead, preserves setoff rights that otherwise exist under non-bankruptcy federal or state law. *See Citizens Bank of Maryland,* 516 U.S. at 18, 116 S.Ct. 286; *In re Kleather,* 208 B.R. 406, 413 (Bankr. S.D.Ohio 1997). Thus, to exercise a right of setoff, a creditor must begin by demonstrating valid setoff rights under applicable state or other non-bankruptcy law.

■ The parties in this case have not made it entirely clear whether Michigan or Ohio law applies to determine the validity of Delphi's claimed right of setoff.[5] Nonetheless, both states' laws support that a valid right of setoff exists when two parties owe mutual debts to each other under either the same contract or different contracts. *In re New Haven Foundry,* 285 B.R. 646, 648 (Bankr.E.D.Mich.2002) (applying Michigan law); *Kleather,* 208 B.R. at 413 (applying Ohio law).

The undisputed facts of this case support that Delphi owes USAT approximately $755,120.00 in accounts payable. Delphi argues that it has a right to set off this debt against two debts USAT owes back to Delphi. First, USAT owes Delphi for unpaid rotors. Second, USAT owes Delphi on a claim assigned to Delphi by Texas Foundries. Because the analysis of Delphi's assigned claim involves more complex issues than that of its claim against USAT for unpaid rotors, the court will analyze each separately.

### 1. USAT's debt to Delphi for unpaid rotors

■ The parties agree that USAT owes $567,683.84 to Delphi for unpaid rotors. [Adv. Doc. 35, ¶ 18; Adv. Doc. 41, ¶ 18.] Delphi argues a right to setoff this amount against its accounts payable to USAT. USAT does not dispute that its prepetition debt to Delphi for the rotors may form the basis of a right of setoff; nor does it dispute that Delphi owes $755,120.00 back to USAT.[6] The court concludes that Delphi

---

**5.** USAT is an Ohio corporation located in Dayton, Ohio. Delphi is a Delaware Corporation with various locations, but with its primary business located in Michigan. Delphi argues that the General Terms and Conditions governing the relevant purchase orders provide that the law of the state where the purchase order was issued will govern, but some purchase orders were issued in Ohio and some in Michigan.

**6.** Later in this decision, the court addresses USAT's argument that its debt on the rotors cannot be used as a basis for setoff because Delphi's accounts payable owed back to USAT

may use USAT's prepetition debt for the rotors to establish dual or mutual obligations between the parties forming the basis for a valid right of setoff. *New Haven Foundry,* 285 B.R. at 648 (Bankr. E.D.Mich.2002); *Kleather,* 208 B.R. at 413.

As further support, Delphi demonstrates that it has a contractual right of setoff. Section 21 of the General Terms and Provisions governing the Delphi purchase orders states that:

> With respect to any monetary obligations of Seller [USAT] or Seller's affiliates to Buyer [Delphi] or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.[7]

[Adv. Doc. 36, Ex. 2, ¶ 21.] USAT does not dispute that the purchase orders were subject to this provision providing Delphi with setoff rights. [Adv. Doc. 41, ¶ 11.] Therefore, Delphi has established a valid right of setoff under state law with respect

to the $567,683.84 that USAT owes to Delphi for the rotors.

### 2. USAT's debt to Delphi as assignee of Texas Foundries' claim

■ Delphi argues that it should be able to exercise an additional right to setoff or recoup[8] the amount of USAT's prepetition debt to Texas Foundries for unpaid castings totaling $187,436.84. In August of 2003, Delphi negotiated with Texas Foundries and agreed to pay the company the amount USAT owed for the castings. As part of the agreement, Delphi received an assignment of Texas Foundries' rights against USAT, but did not pay Texas Foundries until January 7, 2004, two weeks after USAT's bankruptcy filing. USAT disputes that this transaction between Delphi and Texas Foundries gives Delphi a valid right of setoff or recoupment against USAT. USAT asserts that the mutuality required for setoff protects against "triangular" setoffs in which a creditor attempts to set off its debt to a debtor with the latter's debt to a third party.

---

were at least partially accrued during the ninety days prior to USAT's bankruptcy filing.

7. This same contractual provision establishes that Delphi may aggregate the debts and claims owed between Delphi's various divisions or "affiliates" and USAT to establish its setoff rights. *See Wooten v. Vicksburg Refining, Inc. (In re Hill Petroleum Co.),* 95 B.R. 404, 411 (Bankr.W.D.La.1988) (noting that related subsidiaries may aggregate claims and debts for purposes of setoff when there is a formal agreement between the debtor and the subsidiaries allowing them to do so); 5 *Collier on Bankruptcy,* ¶ 553.03[3][b][ii] (15th ed. rev. 2004).

8. Delphi argues that the claim it acquired from Texas Foundries is the basis for a recoupment claim against payables due to USAT by Delphi. Unlike setoff which involves mutual debts arising from *different* transactions, recoupment pertains to the extinguishment of mutual claims arising from the *same* transaction. *In re Gaither,* 200 B.R.

847, 850 (Bankr.S.D.Ohio 1996); *Photo Mechanical Services, Inc. v. E.I. Dupont De Nemours & Co. (In re Photo Mechanical Services, Inc),* 179 B.R. 604, 612 (Bankr.D.Minn.1995). Essentially, Delphi argues that its agreement to pay USAT's debt to Texas Foundries was necessary to mitigate damages and irreparable harm to Delphi arising from USAT's difficulties in meeting its obligations pursuant to the Hub Assembly purchase orders. Delphi asserts that this consequential relationship constitutes a single transaction for recoupment purposes. The court questions whether these circumstances transform discreet contractual relationships, between Delphi and USAT on the one hand and between Texas Foundries and USAT on the other, into a single transaction. However, because the court determines that Delphi can setoff the assigned Texas Foundries claim against its debt to USAT, resolution of the recoupment issue is not necessary.

■ As noted previously, setoff allows entities who owe money to each other to cancel out or apply their mutual debts. *Citizens Bank of Maryland,* 516 U.S. at 18, 116 S.Ct. 286. Consequently, a fundamental requirement to exercise a right of setoff is that the debts be "mutual."

■ Although "mutuality" is to be strictly construed for purposes of determining setoff rights under § 553, the Bankruptcy Code does not define the term leaving it subject to interpretation. *King v. Fulbright & Jaworski, LLP (In re Koch),* 224 B.R. 572, 575 (Bankr.E.D.Va. 1998). Generally speaking, debts are "mutual" when they are owing between two parties in the same right and in the same capacity. *Roberds, Inc. v. Lumbermen's Mutual Casualty Co. (In re Roberds, Inc.),* 285 B.R. 651, 659 (Bankr.S.D.Ohio 2002); *Kleather,* 208 B.R. at 413. Consequently, a "triangular setoff," when A attempts to offset an obligation owed to B against B's debt to C, is prohibited because there is no mutuality of debt between two parties. *See Official Committee of Unsecured Creditors v. ITT Commercial Finance Corp. (In re Baja Boats, Inc.),* 1997 WL 811694, at * 7 (Bankr.N.D.Ohio Aug. 15, 1997); *Photo Mechanical Services, Inc. v. E.I. Dupont De Nemours & Co. (In re Photo Mechanical Services, Inc),* 179 B.R. 604, 615 (Bankr.D.Minn.1995).[9]

■ However, the essence of mutuality is that, at the time of setoff, each party owns its claim independently "with the right to collect in [its] own name against the debtor in [its] own right and severally." *Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987). For this reason, triangular situations are not immutable and can be sub-

sequently transformed into two-party transactions with the requisite mutuality prior to or at the time of the setoff.

■ For example, it is well established that where a party, such as a contractual surety, pays an obligation of the debtor, the party obtains a claim against the debtor to the extent of the payment and accedes to mutuality with the debtor for setoff purposes. *Kentucky Central Insurance Co. v. Brown (In re Larbar Corp.),* 177 F.3d 439, 446 (6th Cir.1999); *In re Davicter Enterprises, Inc.,* 248 B.R. 794, 796 (Bankr.S.D.Ill.2000) (recognizing that a party who pays a debt for which the debtor is primarily liable may acquire a claim against the debtor, and a corresponding right of setoff, under the equitable doctrine of subrogation); *In re J.A. Clark Mechanical, Inc.,* 80 B.R. 430, 432 (Bankr.N.D.Ohio 1987).

■ Another way to establish mutuality in a triangular situation is through assignment. This is the argument relied upon by Delphi asserting that, through contractual assignment, Delphi became obligated to pay USAT's debt to Texas Foundries, but also acquired Texas Foundries' rights against USAT. Like subrogation, assignment may transform a triangular transaction into a dual one. Under principles of contract law, when party A pays B's debt to C and obtains a valid assignment of C's rights against B, party A may now "step into the shoes" of C and assert all rights C had against B. *See National City Bank, Northwest v. Columbian Mutual Life Ins. Co.,* 282 F.3d 407, 409 (6th Cir.2002) (interpreting state law in accordance with the *Restatement (Second) of Contracts* § 336). By way of as-

---

9. This case does not require the court to address triangular setoffs involving separate government agencies. Under certain circumstances, these types of triangular setoffs have

been allowed. *See, e.g., Butler v. United States (In re Butler),* 1996 WL 33403850 (Bankr. S.D.Ga. Aug. 12, 1996).

signment, there are mutual debts now owing between parties A and B.

■ Generally, courts are in agreement that an assignment of rights can create mutuality for setoff purposes. *See, e.g., Schechter v. ACME Screw Co., Inc. (In re Assured Fastener Products Corp.),* 773 F.2d 105, 107 (7th Cir.1985) (determining that § 553 allowed setoff by assignment as long as the assignment occurred more than ninety days prior to the bankruptcy); *New Haven Foundry, Inc.,* 285 B.R. at 648 (allowing a setoff established through the assignment of accounts as long as the assignment gave rise to a valid and enforceable debt against the debtor). *Cf. Modern Settings, Inc. v. Prudential–Bache Securities, Inc.,* 936 F.2d 640, 648 (2nd Cir.1991) (suggesting in dicta that in the specific circumstances of that case involving a claim based on breach of a fiduciary obligation, New York law might not allow a setoff based on the assignment of a debt between closely related corporations). Obversely, an assignment to a third party in a transaction that had previously involved only two parties may destroy mutuality by transforming a mutual obligation into a triangular one. *Plantation Equity Group v. Fairfield Plantation, Inc. (In re Fairfield Plantation, Inc.),* 147 B.R. 946, 952–53 (Bankr.E.D.Ark.1992) (concluding that the absolute assignment of a claim to a third party destroyed the setoff requirement that the debts be owed between the same parties standing in the same capacity).

■ In this case, upon Delphi's promise to pay USAT's debt to Texas Foundries, Texas Foundries assigned its rights against USAT to Delphi. Through the assignment, Delphi "stepped into the shoes" of Texas Foundries and obtained Texas Foundries' right to payment from USAT which Delphi wants to setoff against amounts it owes to USAT.[10] The assignment of Texas Foundries rights to Delphi creates dual obligations of payment between two parties, USAT and Delphi thereby establishing mutuality for setoff.[11]

USAT further argues that the setoff should be prohibited in bankruptcy because it would result in Delphi obtaining a higher priority claim than the assignor, Texas Foundries, would have. Indisputably, if Texas Foundries had not assigned its claim against USAT, it would have had an unsecured claim against the estate in this bankruptcy case. Delphi's intended use of its setoff rights under § 553 would elevate the claim's status to a higher priority akin to that of a security interest. *See Koch,* 224 B.R. at 575.

■ The drafters of Bankruptcy Code § 553 acknowledged the concern that creditors might engage in the "trafficking" of claims in order to create a setoff advan-

**10.** USAT argues that Delphi has not only stepped into the shoes of Texas Foundries, but stands in a better position than Texas Foundries because, upon the assignment of the claim, USAT lost the defenses to payment it had against Texas Foundries. This is incorrect. USAT retained the right to assert defenses to payment it would have had against Texas Foundries and could have brought such defenses to payment against Delphi as assignee. USAT has established no such defenses on summary judgment.

**11.** USAT further cites an Ohio Supreme Court case holding that the assignment of a nonnegotiable demand arising on contract defeats a setoff by the debtor of an independent cross demand when they had not become due as of the date of the assignment. *Fuller v. Steiglitz,* 27 Ohio St. 355 (1875). This 130–year–old decision focused on the fact that the claim assigned had not become due at the time of the assignment. In this case, USAT's debt to Texas Foundries had accrued and matured at the time Texas Foundries assigned its right to payment to Delphi. The *Fuller* reasoning is inapplicable to the instant case.

tage in bankruptcy. *See In re Davicter Enterprises, Inc.*, 248 B.R. at 797. For this reason, Congress enacted § 553(a)(2) which states that a right of setoff cannot be established in bankruptcy to the extent that:

> (2) such claim was transferred, by an entity other than the debtor, to such creditor—
>
>> (A) after the commencement of the case; or
>>
>> (B)(i) after 90 days before the date of the filing of the petition; and
>>
>>> (ii) while the debtor was insolvent[.]

11 U.S.C. § 553(a)(2)(A) and (B). Without such a restriction, creditors indebted to a debtor would have an incentive to purchase claims at a discount following the bankruptcy filing, or during the ninety days prior, in order to reduce their indebtedness through the exercise of acquired setoff rights. *Davicter Enterprises*, 248 B.R. at 797. *See also 3 Norton Bankr.L. & Prac.2d* § 63:9 (2004); 5 *Collier on Bankruptcy*, ¶ 553.03[5][a][i] (15th ed. rev. 2004).

█ The language of § 553(a)(2), however, prohibits the acquiring of a right of setoff by way of assignment or claim transfer only during the ninety days prior to the bankruptcy filing and postpetition. The section does not impact a right of setoff acquired by way of transfer or assignment prior to the ninety-day prepetition period.

█ Delphi argues that § 553(a)(2)'s prohibition does not invalidate its Texas Foundries claim because the transfer or assignment of the claim occurred when

Delphi promised to pay USAT's debt to Texas Foundries more than ninety days prior to the bankruptcy filing. Indeed, the "transfer" for setoff purposes occurs when the right to payment is transferred or assigned. *MetCo Mining and Minerals, Inc. v. PBS Coals, Inc. (In re MetCo Mining and Minerals, Inc.)*, 171 B.R. 210, 217–18 (Bankr.W.D.Penn.1994) (noting that a claim is transferred for purposes of § 553(a)(2) when the assignment is executed and the right to payment arises rather than when payment occurs); *Talbot v. Ohio Student Loan Comm. (In re Stall)*, 125 B.R. 754, 758 (Bankr.S.D.Ohio 1991) (holding that a claim is "transferred" for purposes of § 553(a)(2) when the assignment is made). This is true even if the assigned claim is still unpaid and owing at the time the bankruptcy case is filed. *See Braniff Airways*, 814 F.2d at 1036 (noting that a debt that is "absolutely owed" prepetition is not transformed into a post-petition debt simply because it remains due and owing upon the bankruptcy filing); *In re Gibson*, 308 B.R. 763, 766–67 (Bankr. N.D.Tex.2002) (determining that a debt is prepetition even if it is not due or collected until after the bankruptcy filing).

█ In this case, August 26, 2003 is the date of the transfer for purposes of § 553(a)(2). On that date, Delphi became committed to pay USAT's debt to Texas Foundries and, in exchange, Texas Foundries assigned its rights against USAT and released shipment of the castings.[12] [Adv. Doc. 36, Ex. 6.] Furthermore, the date of transfer is not impacted by the fact that Delphi did not pay Texas Foundries until

---

12. The court concludes that Delphi's obligation to pay Texas Foundries arose on August 26, 2003, the date it emailed its agreement to pay USAT's debt to Texas Foundries in exchange for Texas Foundries' release of shipment of the castings even though the agreement was not documented in a formal purchase order and invoice until November of 2003. *See Energy Cooperative, Inc. v. Koch Refining Co. (In re Energy Cooperative, Inc.)*, 100 B.R. 992, 994 (N.D.Ill.1989); *Stonitsch v. Pocasset Food Sales, Inc. (In re Isis Foods, Inc.)*, 38 B.R. 48, 50 (Bankr.W.D.Mo.1983) (holding that a debt is incurred when the debtor becomes obligated to pay and not when it is formally invoiced).

the post-petition date of January 7, 2004. *MetCo Mining and Minerals, Inc.,* 171 B.R. at 217–18. Consequently, because the date of the assignment is more than ninety days prior to USAT's bankruptcy filing, § 553(a)(2) does not limit Delphi's ability to use the assignment to establish its setoff rights.[13]

The court concludes that Delphi has established a valid right to set off amounts it owes to USAT against the $567,683.84 that USAT owed to Delphi for unpaid contractual obligations related to the rotors as well as the $187,436.84 owed to Delphi through the assignment of Texas Foundries' claim. The court will now turn to other defenses raised by USAT including the validity of Delphi's increased setoff rights due to the accrual of its accounts payable during the ninety days prior to bankruptcy and the alleged priority of Provident Bank's security interest in USAT's accounts receivable.

### C. Setoff Rights Accrued During the Ninety Days Prior to Bankruptcy

· ▮ Bankruptcy Code Section 553 generally restricts a creditor's use of setoff rights to those accruing prior to the commencement of the bankruptcy case. 11 U.S.C. § 553(a). Similar to the preference statute, § 553 further limits the ability of a creditor to use setoff rights accruing during the ninety days immediately prior to the bankruptcy filing if a debtor was insolvent during this period.

▮ Specifically, 11 U.S.C. § 553(a)(3) states that a setoff is prohibited to the extent that:

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a)(3). The purpose of this provision is to prevent a creditor from undertaking a build-up of its setoff rights in order to obtain a preference. *Official Committee of Unsecured Creditors v. American Sterilizer (In re Comptronix Corp.),* 239 B.R. 357, 360 (Bankr. M.D.Tenn.1999). *See also Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.),* 893 F.2d 720, 725 (5th Cir.1990).

In this case, USAT argues that during the ninety days prior to the bankruptcy, Delphi accrued $444,214.36 in amounts owing to USAT for the purpose of increasing its setoff rights. Furthermore, USAT alleges that it was insolvent at this time.

Delphi does not dispute the build up of its accounts payable during the ninety days prior to the bankruptcy filing nor that it had the effect of increasing its setoff rights. Instead, Delphi disputes USAT's insolvency, a critical element to the prohibition against increasing setoff rights during the ninety-day period. Depending on the outcome of USAT's turn-

---

13. The court notes that the policy behind § 553(a)(2)'s prohibition is inapplicable to Delphi's setoff rights obtained through the assignment of the Texas Foundries claim. The provision was enacted to prevent creditors from trafficking in claims immediately pre- or post-petition to create a setoff advantage in bankruptcy. 3 *Norton Bankr.L. & Prac.2d* § 63:9 (2004); 5 *Collier on Bankrupt-*

*cy,* ¶ 553.03[5][a][i] (15th ed. rev.2004). In this case, Delphi did not obtain the assignment of the Texas Foundries claim to create a setoff advantage in bankruptcy. Instead, Delphi paid USAT's debt to Texas Foundries, and obtained an assignment of rights, for the legitimate purpose of preserving the flow of necessary supplies for Delphi's own production.

over actions, Delphi argues that USAT may have been solvent during this ninety-day period immediately prior to the bankruptcy filing.

 "Insolvent" is defined within the Bankruptcy Code as the:

> ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> > (i) property transferred, concealed, or removed with intent to hinder, delay or defraud such entity's creditors; and
> >
> > (ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A). To determine insolvency, courts use a "balance sheet" test. *Whittaker v. Citra Trading Corp. (In re International Diamond Exchange Jewelers, Inc.)*, 177 B.R. 265, 269 (Bankr. S.D.Ohio 1995); *Enwotwen Industries, Inc. v. Brookstone Limited Partnership (In re Newtowne, Inc.)*, 157 B.R. 374, 380 (Bankr.S.D.Ohio 1993). Applying this test, a debtor is insolvent "when the debtor's liabilities exceed the debtor's assets, excluding the value of preferences, fraudulent conveyances and exemptions." *International Diamond Exchange*, 177 B.R. at 269. Contingent and unliquidated causes of action that the debtor accrued prepetition should be estimated for purposes of determining their value as an asset. *Grigsby v. Carmell (In re Apex Automotive Warehouse, L.P.)*, 238 B.R. 758, 771 (Bankr.N.D.Ill.1999) (estimating the value of a debtor's cause of action at a reduction to take into account the contingency of no return). *See also Glaser v. Chelec, Inc. (In re Glaser)*, 2002 WL 32375007, at *10 n. 11 (Bankr.E.D.Va. Oct. 25, 2002) (noting the uncertainty of a debtor's insolvency when the debtor had unliquidated damage claims against third parties that had not been valued beyond mere speculation).

 For purposes of determining issues arising under § 553, USAT is presumed to be insolvent during the ninety days prior to the bankruptcy filing. 11 U.S.C. § 553(c). Nonetheless, USAT attempts to demonstrate actual insolvency, on summary judgment, using its adjusted balance sheet at two separate dates. USAT's adjusted balance sheet for approximately ninety days prior to the bankruptcy shows assets totaling $8,900,219 and liabilities totaling $9,954,703. [Adv. Doc. 30, Ex. A–5; Ex. B.] As of the bankruptcy filing date, USAT's book assets totaled $8,671,348 and its liabilities totaled $10,437,691. [*Id.*, Ex. B.] USAT asserts that no substantial change of circumstances occurred during the ninety-day period from September of 2003 through December of 2003 [*Id.*, Ex. B] and, consequently, the court can infer insolvency during this entire period. *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 731 (Bankr.D.Mass.1996); *Kanasky v. Randolph (In re R. Purbeck & Assocs., Ltd.)*, 27 B.R. 953, 955 (Bankr. D.Conn.1983).

Delphi disagrees with USAT's accounting and argues that USAT did not include its prepetition contract cancellation claim against Delphi related to the Saginaw Steering contracts as an asset of the estate. USAT requests $2.2 million in damages on the claim. This cancellation claim was submitted to Delphi in August of 2003 and Delphi argues that the claim is properly considered to be one of USAT's assets during the ninety-day period prior to the bankruptcy filing. If the full $2.2 million in damages is added to USAT's assets as of September 30, 2003, USAT's assets would total $11,100,219 and would be greater than USAT's liabilities of $9,954,703. Furthermore, if this amount is

added into USAT's assets as of the bankruptcy filing, the company would be solvent on that date as well. Delphi asserts that if USAT was solvent during the ninety-day period immediately prior to its bankruptcy filing, the increase in Delphi's setoff claim during this time is valid under § 553.

In response, USAT argues that at least a portion of the Saginaw Steering claim is included in its adjusted balance sheet as of the end of September, 2003. [Doc. 30, Ex. A–5; Ex. B.] USAT asserts that the adjustments total $1,321,091 as an ongoing concern on this date. [*Id.*] While the balance sheet includes adjustments, it is vague with regard to what the adjustments represent, stating only that the adjustments were made because of a "lack of a settlement of cancellation charges with Delphi on the Saginaw Steering column contract." [*Id.*] It is not clear whether the adjustments represent a prepetition valuation of the cancellation claim and USAT's litigation against Delphi.

Delphi has demonstrated that a genuine issue of material fact exists regarding USAT's insolvency during the ninety days prior to its bankruptcy. The critical issue of whether the exercise of Delphi's setoff rights accrued during the ninety days prior to USAT's bankruptcy is prevented by § 553(a)(3) cannot be determined on summary judgment and must proceed to trial.

### D. Priority of Setoff Rights vs. Security Interest in Accounts Receivable

USAT is joined by Provident Bank's assignee Buckeye Retirement Co., LLC, in raising a separate defense to any right of setoff that Delphi establishes: Provident Bank's perfected security interest in USAT's accounts receivable. USAT asserts that Article 9 of the Uniform Commercial Code ("U.C.C.") [14] governs priority disputes between setoff rights that conflict with an Article 9 security interest. Specifically, USAT argues that pursuant to U.C.C. § 9–322 a perfected security interest in accounts receivable prevails over unperfected setoff rights in the same collateral. While recognizing a split of authority on this issue, the court disagrees with USAT's interpretation and application of Article 9 of the U.C.C. in determining the priority of setoff rights.

The analysis must begin with the fundamental premise that Article 9 of the U.C.C. is generally inapplicable to setoff rights. *Zions First National Bank v. Christiansen Brothers, Inc. (In re Davidson Lumber Sales, Inc.)*, 66 F.3d 1560, 1565 (10th Cir.1995); *USBI Co. v. Otha C. Jean & Assocs., Inc. (In re Otha C. Jean & Assocs., Inc.)*, 152 B.R. 219, 222 (Bankr. E.D.Tenn.1993). The limited exceptions to this general rule are set forth at U.C.C. § 9–109(d)(10) which states that Article 9 does not apply to "a right of recoupment or set-off" except that "[s]ection 9–340 applies with respect to the effectiveness of rights of recoupment or set-off against deposit accounts" and "[s]ection 9–404 applies with respect to defenses or claims of an account debtor." U.C.C. § 9–109(d)(10)(A) and (B). Therefore, USAT's reliance on U.C.C. § 9–322, which governs priority among conflicting security interests, is misplaced. This section does not apply to priority disputes between security interests and setoff rights.[15] *United*

---

14. Both parties cite to the standard U.C.C. section numbers rather than to the corresponding state statutory designations in Michigan and Ohio. The relevant sections of the

U.C.C. were adopted by both states without substantive revision.

15. Cases supporting USAT's argument start with the premise that Article 9 treats setoff

*States v. Fleet Bank of Mass. (In re Calore Express Co., Inc.)*, 288 F.3d 22, 45–47 (1st Cir.2002); *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1190 (7th Cir.1990) (noting that the "first to file" rule resolving priority disputes between competing security interests does not control disputes between a secured party and an account debtor asserting its setoff rights).

▇▇ Instead, U.C.C. § 9–109(d)(10) states that the provision of Article 9 applicable to setoff rights of account debtors [16] is § 9–404. U.C.C. § 9–404 is titled "Rights Acquired by Assignee; Claims and Defenses against Assignee" and states in pertinent part:

(a) **Assignee's rights subject to terms, claims, and defenses; exceptions.** Unless an account debtor has made an enforceable agreement not to assert de-

fenses or claims, and subject to subsections (b) through (e), the rights of an assignee are subject to:

(1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

(2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

. . . .

U.C.C. § 9–404(a). This section applies when a contracting party provides a security interest in some or all of its contractual rights to a third party, referred to as the "assignee," [17] without the knowledge or

---

rights as unperfected security interests and, consequently, setoff rights are subordinate to perfected security interests under § 9–322 (formerly § 9–312) and its "first to file" rule. *See Atlantic Kraft Corp. v. Gibson Group, Inc. (In re Gibson Group, Inc.)*, 126 B.R. 759, 761 (Bankr.S.D.Ohio 1991) (following *MNC Comm. Corp. v. Joseph T. Ryerson & Son*, 882 F.2d 615 (2nd Cir.1989)). This premise has been determined to be incorrect, particularly in light of the subsequent revisions to Article 9. Setoff rights are not security interests and are not treated as such under Article 9. *See National City Bank*, 282 F.3d at 409–10 (noting that a right to setoff is not a security interest and should not be confused with one); *Otha C. Jean & Assocs.*, 152 B.R. at 222. Because § 9–322 (formerly § 9–312) resolves disputes between competing security interests, the provision is wholly inapplicable to resolving priority disputes between a security interest and setoff rights. Rather, the priority of a right to setoff vis-à-vis a security interest in the same accounts receivable is governed by § 9–404 (formerly § 9–318). *United States v. Fleet Bank of Mass. (In re Calore Express Co., Inc.)*, 288 F.3d 22, 46–47 (1st Cir.2002); *Davidson Lumber Sales*, 66 F.3d at 1565–66; *Artoc Bank and Trust, Ltd. v. Apex Oil Co. (In re Apex Oil Co.)*, 975 F.2d 1365, 1368 (8th

Cir.1992); *Otha C. Jean & Assocs.*, 152 B.R. at 222. The applicability of § 9–404 to resolving priority disputes between security interests and setoff rights is clarified in the recently revised version of Article 9. *See* § 9–109(d)(10) (revising former § 9–104(i) to clarify that the sole provisions of Article 9 applicable to setoff rights are § 9–340 and § 9–404).

16. Article 9 defines an "account debtor" as a "person obliged on an account." U.C.C. § 9–102(a)(3). In this case, Delphi is the account debtor attempting to exercise a right to setoff amounts owed to USAT.

17. Much of the confusion regarding setoff rights and their priority with respect to security interests arises from the unusual language used in U.C.C. § 9–404(a) (formerly § 9–318). *Otha C. Jean & Assocs., Inc.*, 152 B.R. at 222–23. The section describes a party obtaining a security interest in accounts receivable as an "assignee" rather than a "secured party." *Id. See also PHD, Inc. v. Coast Business Credit*, 147 F.Supp.2d 809, 814 (N.D.Ohio 2001) (analyzing the language of former § 9–318 as codified in former Ohio Rev.Code § 1309.37); *Frank v. ITT Comm. Finance Corp. (In re Thompson Boat Co.)*, 230

consent of the other contracting party, referred to as the "account debtor." *National City Bank Northwest v. Columbian Mutual Life Ins. Co.*, 2000 WL 1675545, at * 3 (N.D.Ohio Sept. 13, 2000)[18] *aff'd*, 282 F.3d 407 (6th Cir.2002). *See also First National Bank of Boston v. Thomson Consumer Electronics, Inc.*, 84 F.3d 397, 400 (11th Cir.1996) (noting that the purpose of former U.C.C. § 9–318 (now § 9–404) is to govern third party rights that arise when contract rights are assigned as part of a secured transaction); *Frank v. ITT Comm. Finance Corp. (In re Thompson Boat Co.)*, 230 B.R. 815, 825 (Bankr. E.D.Mich.1995). To protect the rights of the account debtor, in this case Delphi, U.C.C. § 9–404 makes the granting of the security interest "subject to ... all the terms of the contract" including "any defense or claim" that the account debtor has under the terms of the contract. U.C.C. § 9–404(a)(1). *National City Bank*, 282 F.3d at 410; *First National Bank of Boston*, 84 F.3d at 400–01.

■ In other words, assignee Provident Bank, takes its security interest in USAT's accounts receivable subject to all of the terms of the agreement between the contracting parties, USAT and Delphi, and subject to any defenses arising from their agreement. U.C.C. § 9–404; *National City Bank*, 282 F.3d at 410. The agreement between Delphi and USAT provides Delphi with a right to set off amounts owing between the parties. [Adv. Doc. 35, Ex. 2, § 21.] Consequently, Provident Bank's security interest is taken subject to Delphi's contractual right of setoff.[19]

## CONCLUSION

Delphi has established a valid right to set off amounts it owes to USAT against the $567,683.84 that USAT owes to Delphi for unpaid rotors and the $187,436.84 that USAT owes to Delphi based on the assignment of the Texas Foundries claim. Furthermore, Delphi's setoff rights prevail over Provident Bank's security interest in USAT's accounts receivable.

Nonetheless, a significant portion of Delphi's debt to USAT, totaling $444,214.36, accrued during the ninety days prior to USAT's bankruptcy filing. Bankruptcy Code § 553(a)(3) prohibits the accruing of setoff rights during the ninety-day period prior to the bankruptcy filing while a debtor is insolvent. Because a genuine issue of material fact exists as to USAT's insolvency, the validity of Delphi's setoff rights with respect to $444,214.36 remains in dispute.

For these reasons, the court grants summary judgment to Delphi to immediately exercise its setoff rights in the amount of $310,906.32. The validity of

B.R. 815, 825 (Bankr.E.D.Mich.1995). When applying the labels used in § 9–404 to the parties in the instant case, Provident Bank is the "assignee," USAT is the "assignor," and Delphi is the "account debtor."

18. This case analyzes the application of former U.C.C. § 9–318, now U.C.C. § 9–404, codified as former Ohio Rev.Code § 1309.37, now Ohio Rev.Code § 1309.404.

19. Although the limitation may be inapplicable because Delphi's setoff rights were made a term of the contract, one arguable limit to the priority of Delphi's setoff rights would be if Delphi received notification of Provident Bank's security interest prior to the setoff rights accruing. U.C.C. § 9–404(a)(2). However, a bank's filing of a financing statement to perfect its security interest does not amount to notification for these purposes. *Davidson Lumber Sales, Inc.*, 66 F.3d at 1565–66; *In re Communication Dynamics, Inc.*, 300 B.R. 220, 223 (Bankr.D.Del.2003); *Otha C. Jean & Assocs., Inc.*, 152 B.R. at 223. As neither USAT nor Provident Bank has demonstrated any other form of notification to Delphi of Provident Bank's security interest, the court concludes that § 9–404(a)(2) does not limit Delphi's setoff rights in this case.

Delphi's setoff rights as to the remaining $444,214.36 accruing during the ninety-day period prior to USAT's bankruptcy filing must proceed to trial.[20]

**SO ORDERED.**

---

**20.** USAT raises a final argument that summary judgment on Delphi's setoff rights should be delayed until the Saginaw Steering cancellation claim is adjudicated in a separate adversary proceeding. USAT posits that if it succeeds in that adversary proceeding, Delphi will owe USAT significantly more than USAT presently owes Delphi. The court concludes that USAT raises an irrelevant argument to the validity of Delphi's setoff rights. Whether Delphi owes USAT $755,120.00 or over $2.2 million, Delphi may still exercise its setoff rights with respect to the amounts that USAT owes back to Delphi which will have the effect of reducing Delphi's overall indebtedness to USAT.